LANDRY, Judge.
This is an appeal from a judgment in favor of plaintiff municipality and its sewerage district for damages resulting from the alleged defective installation of a sanitary sewer line manifested by failure of the line commencing nine months subsequent to acceptance of the work by the municipality and resulting in total failure thereof five weeks thereafter.
Except as hereinafter otherwise noted, the facts and circumstances giving rise to the instant lawsuit are not in dispute between the parties. By contract executed January 21, 1959, defendant, Hollis R. Temple, t/a Temple Construction Company (sometimes hereinafter referred to simply as “contractor”), undertook installation of *683 a certain sewer project for plaintiffs, the Town of Slidell, Louisiana, and Sewerage District No. 1 — A, Town of Slidell, Louisiana, (sometimes hereinafter collectively referred to simply as “Municipality” or “Town”), said work to he performed according to plans and specifications therefor prepared by the firm of Carnegie & Smith, Consulting Engineers.
At the point of failure the line (consisting of fifteen inch vitrified day pipe) was laid in water-bearing sand at a depth of approximately ten feet as a segment of a gravity flow sewerage system. Before the line was laid the trench was dried by means of well points thus providing a proper foundation in which the pipe was installed according to contract specifications calling for excavations to accommodate the bell joint of each length of pipe in order that full bearing was had upon the barrel of each section. All joints were sealed and the trench in which the line was laid was back-filled and tamped in accordance with contract specifications. The line was put into service in or about October, 1959, and a pre-existing 8-inch subdivision line was tied into the system at a manhole situated approximately sixty feet south of the point of failure. The municipality formally accepted the work in April, 1960. Subsequently, in or about December, 1960, (slightly longer than a year after the line was put in use, a sinking of the surface soil was noted above the point of eventual failure. Approximately five weeks thereafter the line collapsed and failed completely whereupon Contractor and his surety were promptly notified of the break but defendant refused and declined to take any action to remedy the defect on the ground he had satisfactorily performed all obligations under the construction contract and was not responsible for the condition which resulted. Pending some action by the contractor, the municipality was compelled to dispose of sewerage by dumping same into open ditches. When the municipality became convinced contractor would assume no liability for the condition of the line the services of Clifford C. Ouder, contractor, were engaged to excavate at the point of failure to determine the nature and cause of the defect. Upon excavation of the failure site, it developed that from three to five lengths of pipe had settled or sunk, the lowest point being approximately 18 inches below grade. The pipe, however, was intact excepting one or two joints at which the bell of the pipe was broken on top. South or upgrade from the break the pipe was found to be clear of sand but north or downgrade the line contained a large accumulation of sand which clogged the line for a distance of approximately 300 feet but did not completely block the line. Upon discovering the aforesaid condition, the municipality employed a Mr. Ouder to make the necessary repairs. When it developed Ouder was unable to free the line of accumulated sand, the services of Rotor Rooter Sewer Company were engaged for that purpose. The entire cost of repair amounted to a total of $5,199.53, for which sum the trial court awarded judgment in plaintiff’s favor.
The issue before the court on appeal is conceded by all 'concerned to be purely factual. Tersely stated, the question is: What caused this particular section of the sewer line to collapse?
In order that the position of the municipality may be better understood we deem it advisable to narrate in some detail certain circumstances concerning which there is no dispute between the litigants but which, nevertheless, are material to the factual issue to be resolved herein.
During the construction process, it developed that water-bearing sands were encountered in certain areas of the municipality necessitating the installation of “well points” which the record discloses constitutes in essence a system of pumps designed to free the trench of water to provide a firm sand bed on which to lay the lines. At the point of failure water bearing sand was encountered but well points were installed and the trench properly dried and prepared prior to installation of the line. Lengths of *684 vitrified clay sewer pipe fifteen inches in diameter were utilized in constructing the line. Each length of pipe was so constructed that one end was larger than the other. The larger end of each section of pipe was so made that it flared out in the nature of a bell consequently, in the trade the larger portion of each pipe length is known and referred to as the “bell”. The purpose of the bell is to admit the end of the adjoining length of pipe to be inserted therein a distance of approximately two inches thus providing a continuous, unbroken conduit or line. The joints thusly formed, however, do not result in a complete seal and if left in this condition would permit the escape of sewerage as well as admit into the line entry of dirt and sub-surface water, neither of which conditions may be tolerated. Each joint, therefore, is sealed with a cement mixture known as "grout” or by a procedure known as “pouring”. The pouring process consists ,of two stages, the first of which is referred to as "caulking”. According to the record, caulking is an operation wherein a twine like material known as “Oakum” is packed and compressed into the entire circumference of the interior of each bell opening by means of a blunt metal instrument or tool thus blocking and stopping up the opening otherwise existing in the joint. After the Oakum is properly packed around the entire joint circle, molten asphalt is then poured completely around the bell opening adhering to the pipe and oakum and forming an effective seal preventing leakage. It is conceded that in the case at bar although the contract specified all joints made in the trench would be sealed with grout, such closures, with the knowledge, consent and approval of the Consulting Engineer, were in fact mainly accomplished by pouring. It is conceded that if a joint is improperly or defectively sealed the action of sub-surface water will-cause dirt surrounding the leak to enter the line eventually producing a cavity or hole beneath the line in the vicinity of the leak and ultimately undermining the pipe and causing its collapse.
Succinctly put, the municipality contends the joints at the site of the break were improperly and defectively sealed thus admitting the flow of sand into the line and creating a cavity which caused the line to sink and break. Needless to say, appellants maintain the work was performed in a satisfactory manner in strict accordance with the contract terms and specifications and contractor is, therefore, not responsible for damage resulting from unknown circumstances considering, according to defendant, the cause of the break has not been shown with any degree of certainty.
We shall first dispose of appellants' complaint that the trial court erroneously based its decision on the testimony of the Honorable Homer G. Fritchie, Mayor of the Town of Slidell. The essence of this complaint is that Mayor Fritchie is not a civil engineer and is not qualified to give expert or opinion evidence concerning the alleged cause of the failure.
Appropos appellants’ said complaint is the following rule of law as enunciated in 32 C.J.S. Evidence, § 458 pages 97 and 98:
“Whether a particular witness possesses the necessary qualifications is a question of fact, which should be determined on the basis of the evidence adduced before the witness’ testimony is received. The qualifications of the witness must be affirmatively shown by the proponent of the evidence.”
Also applicable is the following rule stated in 20 Am.Jur. Verbo Evidence, page 659, Par. 786:
“When a witness is offered as an expert upon a matter in issue, his competency, with respect to special skill or experience, is to be determined by the court as a question preliminary to the admission of his testimony. There should be a finding by the court, in the absence of an admission or a waiver by the adverse party, that the witness is *685 qualified; and since there is no presumption that a witness is competent to give an opinion, it is incumbent upon the party offering the witness to show that the latter possesses the necessary learning, knowledge, skill, or practical experience to enable him to give opinion testimony. The opposing counsel have the right to cross-examine the witness as to his competency.”
In 32 C.J.S. Verbo Evidence, § 458, page 99. we note the following pertinent rule:
“The qualification of a witness to state his opinion may be waived by the parties by express stipulation or by failure to object to the testimony when offered.”
It is significant that neither Mayor Fritchie nor any of the other witnesses who gave opinion testimony on the trial of this cause were either tendered by counsel or recognized by the court as expert witnesses. Despite his lack of qualification as an expert, when Mayor Fritchie was called upon to give opinion evidence, no objection was made by counsel for appellants. The aforesaid procedure was mutually engaged in by counsel for both sides even as to the witness, Taylor, who was not shown to have any qualifications whatsoever until it was brought out on his cross examination that he was a graduate civil engineer. Counsel for appellants having failed to timely object to the opinion testimony given by Mayor Fritchie may not assert its inadmissibility at this stage of the proceeding.
Appellants further maintain only slight weight should be accorded Mayor Fritchie’s testimony. In this connection, it appears well settled the weight to be accorded an expert and opinion testimony depends upon the ability and character of the witness, his behavior on the witness stand, the weight and process of reasoning by which he supports his conclusions and opinions, his possible bias in favor of the party for whom he testifies, his opportunity for observation of the matters concerning which he testifies as well as any other tests commonly applied in the evaluation of ordinary evidence. Austin v. Industrial Lumber Co., La.App., 8 So.2d 727; 20 Am.Jur. Verbo Evidence, Page 1056, Par. 1206. In stating their opinions, experts should also state the facts on which those opinions are based, and the opinions themselves are not conclusive but are to be weighed as other evidence. Chandler v. Barrett, 21 La.Ann. 58.
Mayor Fritchie, who holds a Mechanical and Electrical Engineering degree from Tulane University, has been practicing engineering since 1917. He has been Mayor of the Town of Slidell since July 1, 1930, during which tenure of office the totality of his experience with sewerage projects was derived from his official position. On several past occasions extensions were made to the municipal sewer system with the assistance and under the supervision of an engineering firm of which Mayor Fritchie is a member, which firm employs civil engineers. Although the extent of Mayor Fritchie’s experience was not detailed, his testimony, nevertheless, reveals he considers himself equally if not better qualified than most civil engineers regarding matters relating to sewer construction, repair and maintenance.
In awarding judgment for appellees, our learned brother below relied almost exclusively upon the testimony of Mayor Fritchie. In analyzing the testimony of the Mayor, our esteemed colleague below, in written reasons for judgment appearing in the record stated, “he observed the conditions and after eliminating all other possible causes of the trouble, reached the conclusion that the trouble was caused by the improper joint connection and sealing of the joint which permitted the sand to seep through in small amounts over a period of many months resulting in the undermining of the pipe joint and the sinking of the pipe some 18 inches, resulting in the breaking of the pipe from falling into the hole created.”
*686 The record discloses in essence that May- or Fritchie insisted upon his conclusion an improperly sealed joint was the only possible cause of the failure and eliminated the possibility of any other cause by simply refusing to consider any other likely or potential cause. The several attempts of counsel for appellants to determine upon cross examination the process of elimination used by the Mayor in reaching his conclusion or inquire into his reasoning were met by the Mayor’s repeated assertion that in his opinion the cause of the failure was an improperly sealed joint and no other cause or factor contributed thereto. In this regard, it appears he based his position on the fact the town previously experienced three or four similar failures in the old system which failures the Mayor attributed to faulty joint seals.
When the trench was excavated to determine the cause of the difficulty, Mayor Fritchie did not descend into the hole to make a first hand inspection but viewed the exposed pipe from street level. He eliminated the possibility the collapse could have resulted from a faulty foundation or bedding because, in his opinion, no similar difficulty had previously occurred in the municipality as the result of a faulty foundation. Although he conceded additional foundation was normally required when encountering water bearing sand, he was unable to state what the contract in question called for in this regard. Mayor Fritchie further conceded that, as a whole, defendant contractor had performed excellently and in complete accord with the contract plans and specifications. He further conceded that of the many miles of lines involved in the contract, the defect giving rise to the present litigation was the only failure to result.
Mr. S. Steve Carnegie, Civil Engineer, member of a firm of consulting engineers engaged by the Town to design the extension, prepare plans and specifications therefor and supervise installation thereof, testified he was summoned following excavation of the failure site but was unable to see the pipe as the hole was then full of water due to a rain. He was, therefore, unable to give an opinion as to the cause of the break predicated upon observation. He had an opinion based upon what he had been told concerning conditions revealed upon excavation of the failure site but such an opinion is of little or no value considering it is not entirely clear what he was told or upon what information he based his opinion. Carnegie readily conceded the work done by the contractor was generally very satisfactory, and acceptance of the work by the municipality was predicated upon his written recommendation to the town wherein he informed and advised the town authorities the work had been completed in accordance with the contract plans and specifications. In addition, he acknowledged the joints in question would cause no trouble if made in the manner provided for in the contract. Mr. Carnegie further acknowledged no special foundation was required at the point of failure and none had been recommended by the engineer in charge of construction because the water had been properly drained from the trench prior to laying the line by the use of well-points.
James A. Taylor, Engineer, employee of the consulting engineering firm in charge of the work, testified several possible causes could have produced the failure but since he did not view the pipe following excavation he was unable to state the precise cause of the break. He further stated that one Kirk Roussel, an inspector employed during construction, made a shine test of the line following installation. Taylor explained a shine test is made by shining a light through the line to determine whether the line is properly installed and ready for service, one of the purposes of the test being to detect seepage. According to Taylor, the shine test will reveal an imperfectly sealed joint, unless there is an excessive amount of water flowing through the pipe at the time of making the test.
S. P. Applewhite, a consulting engineer specializing in utilities installations, including sanitary sewer systems, testifying on behalf of appellants, was given all pertinent *687 established facts by hypothetical question but was unable to give an opinion as to the precise cause of failure. He indicated a leaky joint could have undermined the line causing the pipe to sink and break. On the other hand, however, he stated settlement from any other cause (such as failure of the foundation) could also have produced the same result.
Edward T. Rocko, Superintendent for defendant company, W. B. Felts, General Foreman, and defendant, Hollis Temple, testified in substance they were unable to determine the exact cause of the failure. They opined, however, a possible cause, among others, was an accumulation of sand in the newer and larger line adding weight to such extent as to cause the pipe to sink and eventually break. In this regard they theorized sand was carried from the existing 8 inch line into the newer and larger line where it settled out due to the decrease in velocity of flow. These same witnesses suggested the break could have resulted from foundation failure or the shifting of soil following installation although neither could state with certainty the true cause of the rupture.
Our analysis of the principal testimony regarding causes or possible cause of the difficulty shown, leads to consideration of appellant’s final contention, namely, the complaint the judgment of the trial court is contrary to the ruling of the Supreme Court in Keller Construction Corp. v. George W. McCoy & Co., 239 La. 522, 119 So.2d 450. Plaintiff-appellee maintains the Keller Construction Corp. case, supra, is inapplicable and while we agree with counsel for appel-lee in this regard, nevertheless, a review of the cited authority will not only reveal the reasons for its inapplicability but will also shed some light on the problem with which we are confronted in the present case.
In the Keller Construction Corp. case, supra, a contractor sued his subcontractor for damages resulting from failure to a sewer system which experienced nine breaks within four months of completion, all occurring prior to acceptance of the work. The cause of action therein asserted arose and suit thereon was filed prior to adoption of LSA-R.S. 9:2771 which in effect provides no contractor shall be liable for defects in work constructed in accordance with plans and specifications furnished him when the defects are due to insufficient plans, consequently the cited statute could not be applied therein. The court held LSA-C.C. Article 2758 renders the contractor liable for the destruction of work prior to delivery and acceptance by the owner notwithstanding the destruction results from defective, inadequate or insufficient plans and specifications furnished by the owner. An exception to the rule, however, was recognized in those instances wherein the owner expressly or impliedly warrants the sufficiency of the plans, but the court also held the contractor who invokes the exception noted bears the burden of establishing the destruction resulted from defective plans and specifications. In the case at bar we pretermit entirely all consideration of the applicability of LSA-R.S. 9:2771 inasmuch as there is no contention herein the plans were faulty and also because the record overwhelmingly establishes the proposition that the contractor completely and fully complied with the contract plans and specifications.
The correlative of the rule contained in LSA-C.C. Article 2758 is that the contractor is not liable for destruction of the work after delivery to the owner unless, pursuant to the provisions of LSA-C.C. Article 2769, he has failed to perform work in the agreed manner. After acceptance, the burden of proving defective performance rests upon the owner. Justiss-Mears Oil Company v. Pennington, La.App., 132 So.2d 700.
The evidence in the case at bar clearly preponderates in favor of the conclusion the contractor herein performed all work in strict accordance and compliance with the contract plans and specifications. Under the circumstances obtaining herein, we con- *688 elude our learned brother below erred in that he, in effect, placed upon defendant contractor the burden of establishing the failure resulting from some cause other than defective workmanship as alleged by plaintiff.
It is fundamental law that a plaintiff must establish his cause by a fair preponderance of evidence. Moore v. Employers Liability Assurance Corporation, La.App., 124 So.2d 804; Newsom v. Temple, La.App., 66 So.2d 357; Morris v. Vining, La.App., 49 So.2d 458. In the case at bar plaintiffs’ contention the failure resulted from a defective joint is not established by a fair preponderance of evidence. Our careful review of the evidence leads to the conclusion the exact cause of the failure is not shown with any degree of certainty. While we may conclude defective workmanship was a possible cause of the failure, the record does not establish such to be the cause to that degree of certainty required by law. Predicated upon the evidence of record we find that attributing the failure to defective or faulty performance by the contractor is mere theorizing- — at best conjecture or unsupported probability. Proof of such nature is insufficient basis for an award of damages in a court of law.
For the reasons hereinabove assigned, the judgment of the trial court is annulled, rescinded, set aside and reversed and judgment rendered herein in favor of defendants-appellants, Hollis R. Temple f/a Temple Construction Company and U. S. Fidelity & Guaranty Company and against plaintiffs-appellees, Town of Slidell, Louisiana and Sewerage District No. 1-A of the Town of Slidell, Louisiana, rejecting and dismissing said plaintiffs’ demands at plaintiffs’ cost.
Reversed and rendered.